UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ANTHONY BROWN | No. 19 CR 949<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

The government queried automatic license plate reader databases to identify a car that was near two different bank branches around the time someone robbed those two branches. Using license plate registration records, images from the license plate reader databases, and separate surveillance footage, the agents tied the car to Anthony Brown; other evidence tied Brown to two other bank robberies. The grand jury charged Brown with four counts of bank robbery, [48], and Brown moves to suppress any evidence derived from the license plate reader databases. [59].[1]

A man in a white hooded sweatshirt robbed a U.S. Bank branch in Berwyn, Illinois, in September 2019. [61] at 3–4. About two weeks later in October, a man in a white hooded sweatshirt robbed a U.S. Bank branch in Chicago. [61] at 4. A surveillance camera recorded a white four-door Volkswagen with a tinted sunroof in the alley behind the Chicago bank at the time of the October robbery. [61] at 5. Another camera recorded a similar white four-door Volkswagen with a sunroof

---

[1] Bracketed numbers refer to entries on the district court docket and referenced page numbers are taken from the CM/ECF header placed at the top of filings.

parked about a block away from the bank, about 30 minutes before the robbery. [61] at 5–6. That video depicted the driver putting a white garment over his upper body. [61] at 6. It also showed a City of Chicago Department of Revenue booting van passing by the Volkswagen; that van had a license plate reader. [61] at 6; [65-1] at 6. FBI agents investigating the robbery asked the Department of Revenue for any video or pictures the van took of the Volkswagen. [65-1] at 6. The department responded with images of the car and close-ups of a license plate starting with BF. [65-1] at 2–4. But that license plate was not registered to a white Volkswagen; it was registered to a red Chevrolet and that plate had been reported stolen. [61] at 6.

The FBI asked the National Insurance Crime Bureau to look at the surveillance footage from the alley behind the bank and the Department of Revenue images, and NICB identified the Volkswagen as a 2009 or 2010 model Volkswagen CC, with a panoramic sunroof. [61] at 5; [66] at 6. The agents then asked the Illinois Secretary of State for records of white Volkswagen CCs registered in Chicago or nearby suburbs. [61] at 6, 8. That request generated a list of 46 license plates. [66] at 8. Using that list, the FBI went back to the well of automatic license plate reader databases. [66] at 8.

Automatic license plate readers use high-speed infrared cameras to photograph (at day and night) each license plate that passes by. Samuel D. Hodge, Jr., *Big Brother Is Watching: Law Enforcement's Use of Digital Technology in the Twenty-First Century*, 89 U. Cin. L. Rev. 30, 38 (2020). The cameras can be placed

anywhere, from police vehicles to stationary objects like poles, traffic lights, and overpasses. *Id.* In this case, the FBI queried the Vigilant Solutions system to look for cars that were consistent with the white Volkswagen and near the robberies under investigation. [61] at 6–7; [66] at 8. Vigilant Solutions is a commercial vendor that compiles and makes available data across multiple license plate reader systems (including from local police departments and private entities like repossession services). [66] at 6–7.

The request generated Vehicle Detection Reports for queried license plates, and agents associated one plate, starting with BG, with a white Volkswagen that looked like the car from the alley behind the Chicago U.S. Bank branch. [61] at 6–7; *see also* [61-1] at 19 (Vehicle Detection Report). The BG plate was registered to Anthony Brown. [61] at 8.

Agents then ran the BG plate through the City of Chicago's proprietary program for parking and red-light/speeding tickets and learned about two tickets tied to the BG license plate and issued to Anthony Brown. [61-1] at 2. Agents queried the Chicago Police Department's license plate reader system for any hits on the BG plate within the 3 days before October 11, 2019 (the Chicago robbery occurred on October 8), and learned of seven hits, all on October 11. [61-1] at 3. Vigilant Solutions then provided an analysis of hits on the BG plate between August 1 through October 10, 2019. [61-1] at 4–5. That report showed 15 sightings of the BG plate at 11 addresses between August 1 and October 10. [61-1] at 4–5. Of note to the investigators, license

3

plate readers captured the BG plate twice on September 25, 2019, on I-290 between 9:49 and 9:55 a.m. [61-1] at 4–5, 10, 16. The robbery in Berwyn occurred on September 25 around 9:39 a.m. [61] at 3, 10. The license plate reader images of the BG plate show it on a white four-door Volkswagen with a panoramic sunroof. [61-1] at 3, 4, 20–31.

The Berwyn bank branch exterior surveillance video showed a white four-door car with a panoramic sunroof, a front tire with a black wheel, and a rear tire with a chrome wheel drive in front of the branch about 21 minutes before the robbery. [61] at 8. Chicago police surveillance camera footage from September 25 showed a white four-door Volkswagen with a tinted panoramic sunroof, a front tire with a black wheel, and a rear tire with a chrome wheel, driving near Central Avenue (near the I-290 onramp). [61] at 7–8.

In sum, queries of license plate reader systems gave investigators information about a white Volkswagen with a stolen license plate near the October robbery, and then tied a similar white Volkswagen with a plate registered to defendant Brown to the vicinity of the September robbery.

The agents did not have a warrant to check license plate reader databases, and Brown argues that the queries amount to a search because he has a reasonable

4

expectation of privacy in his movements and to be free from near-constant surveillance. [59] at 8–9.

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quoting U.S. Const. amend. IV). And a "search occurs either when the government physically intrudes without consent upon a constitutionally protected area in order to obtain information, or when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Thompson*, 811 F.3d 944, 948 (7th Cir. 2016) (quotations and citations omitted). Querying the license plate reader databases here wasn't an intrusion of Brown's person, house, papers, or effects, but of course, the Fourth Amendment isn't so rigid. Courts read the amendment "to secure 'the privacies of life' against 'arbitrary power'" and "'to place obstacles in the way of a too permeating police surveillance.'" *Carpenter*, 138 S. Ct. at 2214 (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886) and *United States v. Di Re*, 332 U.S. 581, 595 (1948)).

The agents did not obtain the "privacies" of Brown's life or exploit a too permeating police surveillance. There is no privacy interest in license plates. *See United States v. Miranda-Sotolongo*, 827 F.3d 663, 667–68 (7th Cir. 2016). "Every operator of a motor vehicle must expect that the State, in enforcing its regulations, will intrude to some extent upon that operator's privacy." *New York v. Class*, 475 U.S. 106, 113 (1986). And "it is unreasonable to have an expectation of privacy in an object

5

required by law to be located in a place ordinarily in plain view from the exterior of the automobile. […] The exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search.'" *Class*, 475 U.S. at 114 (1986). "A person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *United States v. Knotts*, 460 U.S. 276, 281 (1983). It follows from these propositions that learning that a particular license plate attached to a car was on public streets 23 times (counting the BF plate) between August 1 and October 11, 2019, was the product of routine, non-invasive surveillance and did not upset settled expectations of privacy.[2] "[T]he government's use of a technology in public use, while occupying a place it was lawfully entitled to be, to observe plainly visible happenings, did not run afoul of the Fourth Amendment." *United States v. Tuggle*, 4 F.4th 505, 511 (7th Cir. 2021). So too here.

But maybe focusing on license plates and public travel is giving short shrift to broader Fourth Amendment concerns. These cameras and databases are a technological advance; they capture license plates passing by at a high rate of speed and in the dark of night. Mining such enhanced historical information to piece together a person's movements might encroach on society's expectations and justify

---

[2] The government adds that Brown could not have an expectation of privacy in the BF plate because it was stolen and not registered to him. But I understand Brown's position to be that, at least for purposes of this motion, he was using the white Volkswagen while it had the BF plate on it and adding it to the pattern of movements associated with the Volkswagen was a search of his movements. It's not the license plate (either the BF or BG plate) that gave him an expectation of privacy, but the whole of his movements.

6

Fourth Amendment intervention. In *Knotts*, the Court said that there is no reasonable expectation of privacy in public automobile travel, but noted that different constitutional principles may apply to dragnet-type law enforcement practices. *Knotts*, 460 U.S. at 284. Short-term monitoring of "a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable." *United States v. Jones*, 565 U.S. 400, 430 (2012) (Alito, J., concurring). But society does not expect the government to engage in longer-term GPS monitoring, cataloguing every single movement of a person's car, to investigate most crimes. *Id.* This is especially so when location monitoring reveals "a wealth of detail about [a person's] familial, political, professional, religious, and sexual associations." *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring). Aggregating and then accessing even entirely public travel can invade a reasonable expectation of privacy in the whole of someone's physical movements. *Carpenter*, 138 S. Ct. at 2215, 2217, 2219.

But that's not what happened here. The database results did not reveal the whole of Brown's movements.[3] The cameras "exposed no details about where [Brown] traveled, what businesses he frequented, with whom he interacted in public, or whose homes he visited, among many other intimate details of his life." *Tuggle*, 4 F.4th at 524. The record contains about two dozen snapshots of a car on the streets over ten

---

[3] The license plate readers did not capture the identity of the driver or any passengers, so by themselves did not reveal anyone's movements—additional evidence is necessary to link the Volkswagen to Brown's movements. But inference does not insulate a search. *See Carpenter*, 138 S. Ct. at 2218 (quoting *Kyllo v. United States*, 533 U.S. 27, 36 (2001)).

weeks, and that data tells us very little about the privacies of Brown's life. The Fourth Amendment is supposed to slow down police surveillance, but at present, this technology does not call for constitutional correction.[4]

The agents did not conduct a search under the Fourth Amendment when they queried the automatic license plate reader databases. Defendant Brown's motion to suppress is denied.[5]

ENTER:

Date:   October 26, 2021

                                          Manish S. Shah
                                          United States District Judge

---

[4] *See* Orin S. Kerr, *An Equilibrium-Adjustment Theory of the Fourth Amendment*, 125 Harv. L. Rev. 476, 480 (2011) ("When new tools and new practices threaten to expand or contract police power in a significant way, courts adjust the level of Fourth Amendment protection to try to restore the prior equilibrium.").

[5] Because the database inquiry was not a search, I do not reach the government's arguments that the exclusionary rule does not apply. But I note that this is not a case where agents acted under express authority that allowed their conduct. *See United States v. Curtis*, 901 F.3d 846, 848 (7th Cir. 2018); *United States v. Castro-Aguirre*, 983 F.3d 927, 935 (7th Cir. 2020) (evidence admissible when obtained in good-faith reliance on court order issued under the Stored Communications Act). Nor is this a case where agents relied on binding appellate precedent. *See Davis v. United States*, 564 U.S. 229, 240 (2011). The agents likely lacked the culpability necessary to justify exclusion of evidence, *see id.* at 239–40, but the good-faith exception is not as clear-cut as in *Curtis*. As for inevitable discovery, the lawful identification of the Volkswagen associated to Brown likely would have followed his arrest for the December robbery and a routine background check. But the government has not shown that discovery of the Volkswagen's location on September 25 would have occurred through any lawful means other than the warrantless automatic license plate reader database inquiry.